**UNITED STATES of America, Appellee,**

v.

**Lewis MATTHEWS, also known as "Country", Defendant–Appellant.**

**No. 750, Docket 96–1419.**

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1996.

Decided Jan. 3, 1997.

Abraham L. Clott, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City, for Defendant–Appellant.

Geoffrey R. Kaiser, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Ira M. Feinberg, Assistant United States Attorney, New York City, on the brief), for Appellee.

Before: VAN GRAAFEILAND, JACOBS, and CALABRESI, Circuit Judges.

JACOBS, Circuit Judge:

New York's Kenmore Hotel was seized by the federal government in civil forfeiture proceedings, and its running was placed in the hands of the United States Marshals Service. The Marshals Service contracted out the maintenance of the premises to P & L Management and Consulting ("P & L"), a private firm. Thereafter defendant Lewis Matthews, a tenant in the hotel, assaulted Pjeter Boga, a handyman employed by P & L, while Boga was installing wallboard in Matthews's room. Matthews now appeals from a June 28, 1996 judgment of the United States District Court for the Southern District of New York (Sand, *J.*), convicting him of violating 18 U.S.C. §§ 111(b) and 1114 by assaulting with a dangerous weapon an individual employed to assist the Marshals Service in the performance of its official duties.

In relevant part, §§ 111(b) and 1114 make it a federal crime to "forcibly assault[ ]" with a "dangerous weapon" a United States marshal—"or person employed to assist such marshal"—"while engaged in or on account of the performance of official duties." *See* 18 U.S.C. §§ 111(a)-(b), 1114.

Matthews was convicted by a jury on January 3, 1996, and sentenced (on June 26, 1996) to 100 months of imprisonment followed by two years of supervised release, and to payment of a $5,000 fine and a $50 special assessment. On appeal, Matthews argues: (a) that Boga's installation of the wallboard did not fall within the terms of §§ 111(b) and 1114 as employment that assisted the Marshals in the performance of official "law enforcement" duties; (b) that the district court's jury charge employed an erroneous definition of "dangerous weapon"; and (c) that the district court failed to appreciate its power to depart downward in his sentence due to the atypical facts of the case.

We affirm.

## BACKGROUND

In June 1994, the federal government commenced civil forfeiture proceedings against the Kenmore Hotel, the largest commercial single-room occupancy hotel ("SRO") in New York City.[1] The government alleged that illegal conduct on the premises was pervasive. *See generally United States v. All Right, Title and Interest,* 888 F.Supp. 580, 581–83 (S.D.N.Y.1995), *aff'd,* 77 F.3d 648, 650–51 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996). Despite entreaties by federal and local authorities over a period of years, the hotel's ownership failed to take corrective action, and the Kenmore became "a beehive of narcotics-related activities, including the sale, distribution, preparation, packaging and/or possession of narcotics." 77 F.3d at 651. In the three and one-half years prior to the commencement of the forfeiture proceeding, there were nearly 200 reports of narcotics incidents at the hotel, more than 100 drug arrests, and approximately 70 resulting convictions. *Id.*

On June 6, 1994, Judge Sprizzo in the Southern District of New York issued a warrant, pursuant to 21 U.S.C. § 881(b), permitting the government to seize the Kenmore

---

1. The Kenmore has 22 stories and more than 600 single-occupancy units, many occupied by residents who are "elderly, infirm, and/or on public assistance." *United States v. All Right, Title and Interest,* 77 F.3d 648, 650–51 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996). The government's in rem complaint against the Kenmore, filed pursuant to 21 U.S.C. § 881(a)(7), was based upon the distribution of cocaine at the hotel, in violation of 21 U.S.C. § 841(a)(1). *United States v. All Right, Title and Interest,* 888 F.Supp. 580, 582 (S.D.N.Y.1995).

and manage it pending final resolution of the forfeiture action. 888 F.Supp. at 582. Once the government assumed control over the Kenmore, its maintenance became the responsibility of the Marshals Service, which contracted with P & L, a private company, to handle the day to day management of the hotel.

In the Spring of 1995, Matthews was the occupant of room 907 at the Kenmore. On May 23, 1995, Pjeter Boga, a handyman employed there by P & L, went to Matthews's room with a co-worker to repair a hole in one of the walls. Matthews had submitted a work order for the repairs, knew that the work was scheduled for that day, and had given his permission for it to be done.

When the work began, however, Matthews complained loudly that Boga and his co-worker were installing the sheetrock inside out. Matthews grew increasingly volatile and aggressive, and eventually reached under his bed and pulled out a multi-purpose kitchen knife. As Matthews advanced knife in hand toward Boga, uttering loud threats, Boga's co-worker left to get help. Matthews trapped Boga in a corner of the room, held the knife to Boga's head for approximately two minutes, and screamed, *inter alia*, "Are you understanding what I am saying, do you understand me now?" Boga attempted to placate Matthews and confirmed that he would "do the job however [Matthews] said." As Boga resumed work, Matthews sat down to supervise (still holding the knife) in a chair placed so as to block Boga's exit from the room. Boga testified that he thought Matthews would cut him in the face and that he believed he was going to die. Hotel security guards soon arrived, persuaded Matthews to relinquish the knife, and escorted him to the hotel lobby, where he was arrested by New York City police. The FBI arrested Matthews two days later on a federal complaint charging him with assaulting Boga.

At no time before or during the trial did Matthews object to the applicability of §§ 111(b) and 1114 to the facts of his case, or to the sufficiency of evidence for a conviction under these statutes. Nor did Matthews raise any timely objection to the jury instruction defining "dangerous weapon." After a two-day trial (held January 2 and 3, 1996), the jury found Matthews guilty as charged.

Prior to sentencing, Matthews (acting through his counsel as well as pro se) filed papers seeking either dismissal of the indictment on the ground that §§ 111(b) and 1114 were inapplicable, or a reduction in sentence on the (related) ground that the atypical facts of the case took it outside the "heartland" of prosecutions for assaults on federal officers. At the sentencing hearing, on June 26, 1996, the district court rejected the arguments concerning the scope of §§ 111(b) and 1114, and denied the motion for a downward departure. The court sentenced Matthews (pursuant to the career offender guidelines) to 100 months imprisonment (the bottom of the applicable range in his case) and to two years of supervised release, and ordered him to pay a $5,000 fine and a $50 special assessment.

### DISCUSSION

Matthews makes three arguments on appeal: (1) that there was insufficient evidence to establish an element of his alleged offense under §§ 111(b) and 1114, namely, that the victim (Boga) had been "employed to assist" the United States Marshals and was performing "official" (*i.e.*, "law enforcement") duties at the time of the assault; (2) that the district court charged the jury with an overbroad definition of "dangerous weapon"; and (3) that the district court failed to appreciate its power to make a downward departure (under the United States Sentencing Guidelines) in consideration of the atypical nature of the case. The jury charge issue and the sentencing issue may be disposed of quickly.

■ A. *Jury Instruction.* Judge Sand's jury instruction defining "dangerous weapon" was not plainly erroneous. Matthews did not object to the charge at trial, and thus his claim must be evaluated under the "plain error" standard, pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure. Out of the presence of the jury, Judge Sand described for the record the weapon that Matthews used as "a rather unique kitchen implement" with "a serrated edge on one side[,] ... a straining device in the center[,]

... a side for removing nails, and a bottle cap." He stated that the device, "which is sold as an all purpose knife," had a "rather unique configuration" and was "far from a standard kitchen or butcher knife." Judge Sand instructed the jury that: "[w]hether the object specified in the indictment is a deadly or dangerous weapon depends on the facts of the particular case. Almost any object which, as used, or attempted to be used, may endanger life or inflict great bodily harm can be a deadly or dangerous weapon."

Matthews protests that, under Judge Sand's instruction, the jury could find "[a]lmost any object" to be a dangerous weapon. But that is in fact a fair statement of the settled law in this and other circuits. Because "it is the *use or threatened use* of the object which makes [an] assault aggravated," *United States v. Hudson*, 972 F.2d 504, 507 (2d Cir.1992) (emphasis added), virtually any object—including, without doubt, the multipurpose implement employed here—can qualify as a dangerous weapon depending on how it is wielded in the circumstances. *See, e.g., United States v. Murphy*, 35 F.3d 143, 147 (4th Cir.1994) ("whether an object constitutes a dangerous weapon hinges ... [in part] on the manner in which the object is used[;] many objects, even those seemingly innocuous, may constitute dangerous weapons"), *cert. denied*, — U.S. —, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995); *United States v. Schoenborn*, 4 F.3d 1424, 1433 (7th Cir.1993) (whether an object is a dangerous weapon depends on the circumstances of the case, as "the manner in which the object is used in the assault is determinative"); *United States v. Moore*, 846 F.2d 1163, 1166 (8th Cir.1988) ("Almost any weapon, as used or attempted to be used, ... may be a dangerous and deadly weapon."); *Hudson*, 972 F.2d at 507 ("A defendant can not be guilty of assault with a non-inherently dangerous weapon ... unless the object is used (or its use is threatened) in a dangerous way.").

The correct instruction, Matthews urges, is that a dangerous weapon "means any instrument or device capable of inflicting serious bodily injury or causing [ ] death," or that such a weapon "includes any object capable of being readily used ... to inflict severe bodily injury." Appellant's Brief at 21. This formulation is almost indistinguishable from the instruction that Judge Sand actually delivered to the jury.

B. *Sentencing.* A downward departure may have been supportable on the ground that Matthews's assault on Boga was an "atypical" fact pattern for prosecution under §§ 111(b) and 1114. But Matthews has not shown that Judge Sand's refusal to make such a downward departure is attributable to any belief on Judge Sand's part that he lacked the power to do so. At the sentencing hearing, Judge Sand and counsel for both parties discussed at length whether the prosecution of Matthews under §§ 111(b) and 1114 was a proper exercise of federal jurisdiction. Matthews's counsel requested at the outset "that the court depart downward because ... this case does fall [out]side of the heartland, because of [the] circumstances of the case." Judge Sand's subsequent refusal to depart "on the ground that there was invalid exercise of federal jurisdiction" amounts to a finding that the facts were insufficiently unique to remove Matthews's prosecution from the heartland of cases warranting full application of the statutory penalties. Any doubt on this score is dispelled by Judge Sand's observation, "I believe I have the power to downwardly depart if I think it appropriate."

A district court's discretionary refusal to depart from the Sentencing Guidelines is of course not appealable. *United States v. Moore*, 54 F.3d 92, 102 (2d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 793, 133 L.Ed.2d 742 (1996). While defendants "may appeal a district court's determination that it lacked authority to depart from the guidelines," *id.*, such an appeal requires "a showing that [the] sentencing court was under the mistaken belief that it lacked authority to depart downward." *United States v. McGregor*, 11 F.3d 1133, 1138 (2d Cir.1993). Because Matthews has made no such showing here, we are without jurisdiction to review the district court's refusal to depart downward.

C. *Sufficiency of Evidence.* Matthews's principal argument is that there was insufficient evidence to convict him under

§§ 111(b) and 1114 because Boga was not engaged in official "law enforcement" duties on behalf of the Marshals Service at the time of the assault. As this Court has recognized, "Congress's purpose in enacting § 111 was both to deter harm to certain federal officials and to *deter interference with their law enforcement activities.*" *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987) (emphasis added) (citing *United States v. Feola*, 420 U.S. 671, 678–83, 95 S.Ct. 1255, 1260–63, 43 L.Ed.2d 541 (1975)). "Congress clearly was concerned with the safety of federal officers insofar as it was tied to the efficacy of law enforcement activities." *Feola*, 420 U.S. at 681, 95 S.Ct. at 1262. True, a handyman doing repairs at an SRO is not the person or the role intuitively associated with these statutory protections for federal officers. Nevertheless, we conclude that *this* handyman at *this* SRO was "employed to assist" the Marshals Service in its performance of official "law enforcement activities," and we therefore affirm Matthews's conviction under §§ 111(b) and 1114.

Section 111 provides that whoever, through the use of a "dangerous weapon," "forcibly assaults ... any person designated in section 1114 ... while engaged in or on account of the performance of official duties," is subject to a sentence of up to 10 years imprisonment. 18 U.S.C. §§ 111(a) and (b). Section 1114, in turn, enumerates scores of federal "officers and employees" who are within the coverage of § 111, including "any United States marshal or deputy marshal or person employed to assist such marshal or deputy marshal." 18 U.S.C. § 1114.

■ The "employed to assist" language in § 1114 is not restricted to direct employees of the Marshals Service; it embraces as well persons working for public or private entities that furnish services to the Marshals under contract. *See, e.g., Murphy*, 35 F.3d at 144 (affirming conviction under §§ 111 and 1114 for assault of a guard who was employed by a local county jail that had contracted with the Marshals Service to provide custody for federal prisoners); *United States v. Schaffer*, 664 F.2d 824, 825 (11th Cir.1981) (per curiam) (affirming conviction for assaulting an employee of a private security service · that had contracted with the Marshals to provide

security for federal prisoners being treated at a private hospital). Boga was therefore an individual "employed to assist" the Marshals Service within the meaning of § 1114.

The question is whether the work of a handyman was so far removed from any law enforcement role of the Marshals Service that Boga cannot be deemed to have been "engaged" in "perform[ing]" "official duties," or to have been assaulted "on account of the performance of official duties," within the meaning of § 111. The government points to the expansive list of individuals covered by § 1114, which encompasses many officials who do not engage in "law enforcement" activities: *e.g.*, "any officer or employee of the Postal Service, ... the National Park Service, ... the Bureau of Land Management, ... the [FCC], ... the [FDIC], ... the [RTC]," and "the Army Corps of Engineers assigned to perform ... field-level real estate functions." 18 U.S.C. § 1114; *see also Feola*, 420 U.S. at 679 n. 15, 95 S.Ct. at 1262 n. 15 ("the list of protected federal officers ... [includes some who] are not necessarily engaged in the execution of federal law"). Thus, the government argues that it need only show that Boga was performing services that P & L had contracted to provide to the Marshals Service.

The flaw in the government's categorical argument on statutory scope is that it furnishes no limiting principle, and would extend the coverage of §§ 111 and 1114 to anyone employed in any capacity under any contract with the Marshals Service that was not ultra vires. For example, the government's reading would cover a mechanic on a road call, en route to repair a Marshals Service car, who is punched by another motorist in a traffic dispute. Maybe these statutes can be stretched that far, but we doubt it. We therefore turn to the facts of this case and consider whether Boga's work for P & L at the Kenmore Hotel did advance the "law enforcement activities" of the Marshals Service.

Matthews characterizes Boga as a worker in a hotel that—by a "fortuity"—"had been taken over by the United States government pursuant to a forfeiture order." Appellant's Brief at 11. We are not convinced. Judge Sprizzo did not authorize the seizure of this hotel because mismanagement had resulted

in overbooked reservations, rude bellmen, or long delays in room service. The government's seizure of the Kenmore was a measure to abate rampant and prolonged lawlessness. Unless the building was to be emptied, it was necessary to exert pervasive control over the premises. Physical maintenance of the vast, 600–unit building, and the management of hotel's business and operations were integral to that mission. For that purpose, the Marshals Service could deploy its own employees, hire additional people, or (as it did) contract with a private firm. But whoever did the work would be in a dangerous environment, at the scene of crimes, and would encounter some of the people whose behavior contributed to the pervasive disorder that justified the seizure. The job of a handyman at the Kenmore thus entailed risks that are not commonly encountered by a handyman employed at the Ritz or (for that matter) at any upstanding SRO. Matthews, who used a multipurpose kitchen knife to supervise Boga's installation of wallboard, should be able to appreciate the difference.

In short, we concur in Judge Sand's conclusion (at Matthews's sentencing hearing) that

> the facts of this case serve to demonstrate the appropriateness of somebody working at the direction of a law enforcement officer.... [Matthews] was threatening somebody who was engaged in an activity necessary for the repair and maintenance of the facility. This isn't extraneous or irrelevant activity.... SROs are places where there is a need for law and order.... Obviously there was thought by the federal authorities [to be] a need to enforce federal law in this troublesome facility for which the federal government had responsibility.

We agree that Boga was "employed to assist" the Marshals Service in the "performance of official duties."

## CONCLUSION

The district court's judgment of conviction is affirmed in full.