**UNITED STATES of America,**
**Appellee,**

v.

**Wayne FABIAN, Defendant–Appellant.**

**No. 01–1471.**

United States Court of Appeals,
Second Circuit.

Argued: March 6, 2002.

Decided: Dec. 5, 2002.

Roger Bennet Adler, New York, NY, for Appellant–Defendant Wayne Fabian.

Dwight C. Holton, Assistant United States Attorney for the Eastern District of New York (Alan Vinegrad, United States Attorney for the Eastern District of New York, Jo Ann M. Navickas, Assistant United States Attorney for the Eastern District of New York, on the brief), Brooklyn, NY, for Appellee the United States of America.

Before: McLAUGHLIN, F.I. PARKER, and POOLER, Circuit Judges.

Judge F.I. PARKER dissents in part in a separate opinion.

POOLER, Circuit Judge.

Wayne Fabian appeals from his convictions under the Hobbs Act, primarily arguing that the government failed to show an adequate connection between his crimes and interstate commerce to support federal jurisdiction. For the reasons given below, we find the government proved the nexus to interstate commerce necessary

for Hobbs Act jurisdiction, and thus affirm Fabian's convictions.

## BACKGROUND

■ We review a sufficiency of the evidence challenge "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir.1999), *cert. denied*, 531 U.S. 811, 121 S.Ct. 33, 148 L.Ed.2d 13 (2000) (internal quotations omitted).

Fabian participated in two robberies. The first, on February 11, 2000, involved Fabian and co-conspirators Alex Taveras [1] and Luis Ramirez. The trio forced their way into the Bronx home of Emilio Veraz. The three believed Veraz was a loan shark, because Ramirez had identified Veraz to Taveras as "a loan-shark guy who lends out money." The three beat Veraz, restrained Veraz's son and a visiting neighborhood child, and stole several thousand dollars and some jewelry. At trial, Veraz testified he was a retired taxi cab driver, and also testified he lent $500 to a woman who repaid it in two installments of $300 and $200.

The second robbery, on March 7, 2000 in Queens, involved Fabian, Taveras, Reynaldo Perez and several other men. The target was Yessenia Gomez, common law wife of Juan Montoya. Perez told Taveras and Fabian that Montoya had stolen $300,000 in drug proceeds from drug dealers in Miami, and that the money was either in Gomez's Queens home or her mother's house in Manhattan. Perez was a friend of Montoya since elementary school. At the time of the robbery, Montoya was in prison. Fabian and Taveras forcibly entered Gomez's home, restrained her and her children, and searched the house for the money. When the pair could not find the cash they expected, Fabian kidnaped Gomez and headed off with her to her mother's house to look for cash, while Taveras stayed with the children. Fabian was captured after a police chase. At trial, the government offered into evidence two certificates of conviction: one for Montoya and one for Perez. The certificates showed Montoya and Perez were arrested together in 1990 and convicted of narcotics charges. Defense counsel objected to the admission of the certificates, but the district court permitted them for the purpose of showing Fabian would have believed Perez when Perez said Montoya possessed the drug proceeds.

The jury convicted Fabian of two counts of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951, one count of attempted Hobbs Act robbery in violation of 18 U.S.C. § 1951, and one count of brandishing a weapon during a crime of violence in violation of 18 U.S.C. § 924(c). Fabian was sentenced principally to 168 months imprisonment on each of the Hobbs Act charges, to be served concurrently; and to 84 months imprisonment on the firearms charge, to be served consecutively.

### Discussion

*Sufficiency of the evidence*

■ Fabian first argues the government failed to prove his crimes affected interstate commerce, a showing necessary to support the federal court's jurisdiction under the Hobbs Act. Our precedent permits the jurisdictional requirement of the Hobbs Act to be met by "a showing of a very slight effect on interstate commerce." *United States v. Farrish*, 122 F.3d 146, 148 (2d Cir.1997) (quotation and citation omit-

---

**1.** Taveras testified for the government at Fabian's February 2001 trial.

ted). Fabian argues the Supreme Court's holdings in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), now require the government to prove a "demonstrable economic nexus" with interstate commerce to support Hobbs Act jurisdiction. Thus, he contends, "a local abduction, attendant to an attempted robbery of an individual ... without more, provides an insufficient basis to appropriately exercise federal criminal jurisdiction." Fabian seeks to reverse his convictions on the three Hobbs Act charges. In addition, Fabian argues his firearms charge must also be reversed because it is predicated on the Hobbs Act charge in count three of the indictment. For the reasons given below, we find our precedent remains unchanged by either *Lopez* or *Morrison,* and affirm Fabian's convictions.

Fabian "bears a very heavy burden" in challenging the sufficiency of the evidence. *United States v. Scarpa,* 913 F.2d 993, 1003 (2d Cir.1990) (quotation and citation omitted). "We must view the evidence in the light most favorable to the government and construe all possible inferences in its favor." *United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir.1986).

The Hobbs Act provides:

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned ... or both.

18 U.S.C. § 1951(a).

■ Our precedent requires the government make only a *de minimis* showing to establish the necessary nexus for Hobbs Act jurisdiction. "[T]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice." *Farrish,* 122 F.3d at 148 (quotation and citation omitted). Thus, "all that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect." *Arena,* 180 F.3d at 390 (quotation omitted). " 'Factual impossibility' is no defense to the inchoate offense of conspiracy under the Hobbs Act." *United States v. Clemente,* 22 F.3d 477, 480–81 (2d Cir.1994); *see also United States v. Shareef,* 190 F.3d 71, 75 (2d Cir.1999) (proof of potential effect on interstate commerce suffices for both conspiracy and substantive Hobbs Act offenses); *United States v. Medina,* 74 F.3d 413, 418 (2d Cir.1996) ("Many pre-existing circumstances may doom a conspiracy, without rendering the conspirators any less culpable for their acts.").

We previously rejected the proposition that *Lopez,* 514 U.S. at 567–68, 115 S.Ct. 1624, requires us to alter our *de minimis* standard for establishing Hobbs Act jurisdiction. *Farrish,* 122 F.3d at 148–49. In *Lopez,* the Supreme Court held that Congress unconstitutionally exceeded its power under the Commerce Clause in enacting the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A). *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624. We held in *Farrish* that the *Lopez* Court distinguished between statutes requiring a particularized showing of federal jurisdiction, such as the Hobbs Act, and statutes lacking such an express requirement, such as the Gun–Free School Zones Act. *Farrish,* 122 F.3d at 149. Thus, we held "*Lopez* did not raise the jurisdictional hurdle for bring a Hobbs Act prosecution," and reaffirmed the *de minimis* standard. *Id.* at 148.

Our logic in analyzing *Lopez's* impact on Hobbs Act jurisdiction applies in our analysis of *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 · L.Ed.2d 658 (2000). In *Morrison,* the Supreme Court struck down a civil cause of action for gender-related violence created by the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981(b). *Morrison,* 529 U.S. at 616–17, 120 S.Ct. 1740. The Court found Congress' power under the Commerce Clause did not extend to "regulat[ing] non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617, 120 S.Ct. 1740. As in *Lopez,* however, the Court noted that § 13981(b) lacked a "jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at 613, 115 S.Ct. 1624. The Court noted, with approval, that sections of VAWA containing jurisdictional elements have been upheld by various Courts of Appeal. *Id.* n. 5. As the Hobbs Act requires a particularized jurisdictional showing, we find *Morrison* does not affect our requirement that "the Government need only show a 'minimal' effect on interstate commerce" to support Hobbs Act jurisdiction. *Farrish,* 122 F.3d at 149.

■ Applying the *de minimis* standard to the proof presented at Fabian's trial, we find the government met its burden. Even assuming *arguendo* that Fabian is correct in stating Veraz was not a loan shark and there is no proof Montoya stole drug proceeds, the fact that it was impossible to carry out the planned schemes does not bar Hobbs Act liability. *Clemente,* 22 F.3d at 480–81. What is legally relevant is whether at the time of the crime, Fabian believed he was robbing a loan shark and the proceeds of a drug deal, not whether the crimes actually involved a loan shark and the proceeds of a drug deal. There is

sufficient evidence to support Hobbs Act jurisdiction. Taveras testified Ramirez had told Fabian that Veraz was a loan shark. Taveras also testified that Ramirez told Fabian that Ramirez's family had just finished repaying Veraz approximately $6,000 that the family had borrowed. Ramirez's mother also testified that she had borrowed money from Veraz and taken Ramirez with her when making a loan payment. In regard to Gomez, Taveras also testified he and Fabian intended to steal $300,000 in drug proceeds when they targeted Gomez for robbery. Taveras testified that Perez told the pair Montoya stole the money from Miami drug dealers, showing Fabian believed the money was the proceeds of narcotics dealing and had traveled from Florida to New York. Further, both Gomez and Montoya's brother testified that Montoya and Perez knew each other since childhood.

■ We previously held that both drug dealing and loansharking, while illegal, have an effect on interstate commerce. *See United States v. Genao,* 79 F.3d 1333, 1336 (2d Cir.1996) (illegal narcotics); *United States v. Perez,* 426 F.2d 1073, 1077 (2d Cir.1970) (loan sharking), *aff'd,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *see also United States v. Travisano,* 724 F.2d 341, 347 (2d Cir.1983) (discussing loan sharking). It is clear, then, that under our precedent loan sharking and illegal drug transactions fall within the scope of the Hobbs Act. We hold here that because the underlying acts of loan sharking and drug proceeds affect interstate commerce—again bearing in mind that what is relevant is what Fabian believed—Fabian's actions are within the jurisdiction of the Hobbs Act. As to the robbery of Veraz, Fabian believed him to be a loan shark, and by stealing the proceeds of the loan sharking business Fabian depleted the available assets for that business. *See, e.g., United*

*States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994) (Hobbs Act applies when assets are depleted, "thus affecting [the] ability to purchase a commodity that travels in interstate commerce."); *Travisano*, 724 F.2d at 347 ("[W]hen Congress passed a statute making 'loan-sharking' activities a federal offense, the Supreme Court sustained a conviction under the statute and noted that extortionate credit transactions may be purely intrastate and still, in the judgment of Congress, affect interstate commerce."). As to Gomez, Fabian believed the drug proceeds in question traveled in interstate commerce from Miami, Florida, and thus were in the stream of interstate commerce. *See United States v. Rosa*, 17 F.3d 1531, 1546 (2d Cir.1994) (jurisdictional nexus for federal prosecution for conspiracy to receive stolen good provided "if any of the members of the conspiracy to receive stolen goods believed the goods were traveling from outside the state, even if there was no such travel.").

*United States v. Peterson*, relied on by the dissent, is inapposite here. 236 F.3d 848 (7th Cir.2001). In *Peterson*, the Seventh Circuit, in addition to its ruling that the source of the drugs was unproven, rejected the government's alternate attempt to prove interstate nexus when it held that the fact that money was printed out-of-state was insufficient to establish an interstate commerce nexus, since a contrary holding would automatically extend federal jurisdiction to robberies of cash in every state except Texas, the only place besides Washington, D.C. where money is printed. *Id.* at 853–55. We do not disagree with this sensible holding. However, our situation differs, since it involves the supposed transfer through interstate commerce of a distinct sum of money that was itself derived from interstate commerce. Although the *Peterson* court then went on to discuss how the traditional method of proving the nexus was through the depletion of assets theory, we do not believe that this is the exclusive method of proving an interstate commerce nexus when drug proceeds are involved.

▪ Here, contrary to the dissent's contention, Fabian and his associates did not perceive the money merely as "robbery proceeds." To the contrary, Taveras testified to a pattern of robberies of legal and illegal businesses. He noted that the illegal businesses included drug dealers and loan sharks. *Id.* The robbery of the Montoya residence follows this same pattern. The jury, instructed that the interstate commerce nexus would be met if the object of the robbery was drug proceeds, must have believed that Fabian and the other defendants committed this home invasion because they believed they would find a large sum of money originally derived from drug trafficking there. A robbery that specifically targets a large, discreet sum of money derived from interstate commerce affects interstate commerce. We need not rely on the depletion of assets theory in this case.

In *United States v. Gallo*, the Fifth Circuit found an interstate commerce nexus under the federal money laundering statute, which, like the Hobbs Act, requires that the criminal conduct affect interstate or foreign commerce. 927 F.2d 815, 822–23 (5th Cir.1991). In *Gallo*, government agents had observed an alleged drug transaction between Gallo's two co-defendants. After the transaction, one of the co-defendants turned over a box to Gallo, whom an agent later stopped on the highway. The agent's search of Gallo's car revealed the box, which contained a large sum of money. The Fifth Circuit noted, "[D]rug trafficking affects interstate commerce. The proceeds of drug trafficking have a similar effect." *Id.* at 823. The court, "reserving judgment on a case in

which the connection between the money and the drugs or illegal activity is not so clear as it is here, [ ] conclude[d] that Gallo's transportation of the proceeds of drug trafficking affected interstate commerce...." *Id.* at 823. We too believe that drug proceeds affect interstate commerce. Moreover, would-be robbers then target homes such as the Montoya residence, because they believe they will find large sums of money that would not exist absent drug trafficking. Here, the connection between the original drug trafficking and the goal of this robbery is easily traceable, and the evidence of an interstate commerce nexus is sufficient.

■■■■ Fabian also challenges his conviction for brandishing a firearm in violation of 18 U.S.C. § 924(c)(1), first arguing the conviction must be vacated because the predicate Hobbs Act offense charged in count three of the indictment is invalid for lack of jurisdiction. As discussed above, the government introduced sufficient proof to support the predicate Hobbs Act offense, so Fabian's first argument fails. Fabian next argues venue in the Eastern District on the gun charge was improper because he allegedly brandished the pistol only in Bronx County, within the Southern District. However, a defendant charged under 18 U.S.C. § 924(c)(1) may be charged in any district where the underlying crime took place, "even if he did not use or carry the firearm in that district." *United States v. Saavedra,* 223 F.3d 85, 90 (2d Cir.2000), *cert. denied,* 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). That is because "[w]here venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense." *United States v. Rodriguez–Moreno,* 526 U.S. 275, 282, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). As the evidence shows, at least part of the continuing predicate

crime took place in the Eastern District, making venue proper.

*State court certificate of disposition*

Fabian next challenges the district court's admission of the 1991 state court certificate of dispositions for Perez and Montoya. He argues admitting the certificates constitutes reversible error because the certificates went to prove the drug money was at the Gomez residence, and the connection between a 1991 drug conviction and a 2000 drug robbery is too attenuated to be probative. The government argues it offered the certificates to show Perez, the source of information for the Gomez robbery, knew Montoya well. Thus, the government argues, "the prior joint conviction of Montoya and Perez, especially when coupled with the testimony of their long-standing friendship, made the allegation that Perez had served as a tipster for the robbery more likely ...."

■■■■ Evidentiary issues are reviewed for abuse of discretion. *United States v. McDermott,* 245 F.3d 133, 140 (2d Cir. 2001). "[D]istrict courts enjoy broad discretion over the admission of evidence." *Id.* "Morever, when reviewing a Rule 403 ruling, we must review the evidence maximizing its probative value and minimizing its prejudicial effect." *Id.* (quotations and citations omitted). Fed.R.Evid. 402 provides, "[e]vidence which is not relevant is not admissible." Fed.R.Evid. 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." The district court did not abuse its discretion in admitting the certificates of disposition. The certificates are relevant because they establish Perez and Montoya had a long standing relationship, enhancing Perez's credibility as a source of information about Montoya. The district

court admitted the certificates for that purpose. As the certificates' probative value outweighed any potential jury confusion, the district court did not abuse its discretion.

### Jury charge

■ Fabian next attacks the district court's jury charge, arguing it failed to require the government to prove an adverse impact on interstate commerce. The district court charged the jury that "obtaining the proceeds of narcotics trafficking, is interstate commerce" and "loan sharking, is interstate commerce." The district court also instructed the jury:

> [T]o satisfy the interstate commerce element, you must find beyond a reasonable doubt that the defendant intended to rob drug trafficking proceeds. You do not have to find that such proceeds actually existed but only that the defendant believed that they did. Similarly, with respect to count 3, to satisfy the interstate commerce element, you must find beyond a reasonable doubt that the defendant intended to rob loan sharking proceeds. You do not have to find that such proceeds actually existed but only that the defendant believed that they did.

As discussed above, the government need not prove an actual impact on interstate commerce. Instead, it need show only "the possibility or potential of an effect on interstate commerce," *Jones,* 30 F.3d at 285, that is, that Fabian believed he was stealing from a loan shark and stealing drug proceeds from Miami. Thus, the jury instruction was proper. *See United States v. Vasquez,* 267 F.3d 79, 87–90 (2d Cir.2001), *cert. denied,* 534 U.S. 1148, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002).

### Preclusion of a witness

■ Fabian next argues that the district court committed reversible error when it prevented Fabian from recalling Taveras during his case-in-chief. Fabian wanted to recall Taveras to solicit testimony that Taveras described Veraz as a numbers runner, rather than a loan shark, at Taveras' plea allocution. Fabian argues this is reversible error, because it kept the jury from learning Veraz's source of income was from something other than loan sharking. The government argues the district court properly refused to recall Taveras because the district court did not believe Taveras' prior statement was inconsistent. Taveras testified in his plea allocution that Veraz was "a loan shark and a number runner," but at trial testified only that Veraz was a loan shark. "The court is accorded broad discretion in controlling the scope and extent of cross-examination." *United States v. Rivera,* 971 F.2d 876, 886 (2d Cir.1992). Taveras' trial testimony did not contradict the statements he made at his plea allocution, thus, the district court did not abuse its discretion in refusing to allow Fabian to recall Taveras.

### Sentencing

Finally, Fabian argues the district court failed to appreciate its power to downwardly depart at sentencing because Fabian's conduct fell outside the heartland of conduct covered by the applicable Sentencing Guidelines. At sentencing, Fabian argued that because the victims of the robberies were involved in illegal activities, the robberies fell outside of the heartland of Hobbs Act activities and merited downward departure. The district court stated:

> That's an interesting argument. I just don't think ... that the sentencing commission has indicated any intention to in effect say what reason, what previously clearly would have been within the heartland now in light of the federalism decision[s] should be considered outside.

That's really the question of jurisdiction and whether federal court should be prosecuting these cases.

As far as I'm concerned until there's a clear decision telling me no, I'm going to follow the prior law that is properly in federal court and this is clearly contemplated by the guideline. It's a nice argument but I am not going to accept it. Fabian argues the record is "unclear as to the Court's awareness of his departure power," requiring a remand for resentencing. The government argues the district court clearly considered Fabian's argument for downward departure and rejected it.

 "A district court's discretionary refusal to depart from the Sentencing Guidelines is of course not appealable," but a defendant may bring such an appeal if he can show the "sentencing court was under the mistaken belief it lacked the authority to depart downward." *United States v. Matthews*, 106 F.3d 1092, 1095 (2d Cir. 1997) (quotations omitted). A sentence is issued in violation of law when a district court refuses to exercise discretion with regard to a defendant's motion to downwardly depart, or if the district court is mistaken in its belief that it lacks such authority. *United States v. Ventrilla*, 233 F.3d 166, 169 (2d Cir.2000); *see also United States v. Tenzer*, 213 F.3d 34, 42–43 (2d Cir.2000).

 Taking the sentencing colloquy as a whole, it is clear that the district court considered Fabian's argument and rejected it. It therefore cannot be said that the district court refused to exercise its discretion. *See Matthews*, 106 F.3d at 1095. Nor can it be said the district court was mistaken in its belief that it lacked the authority to downwardly depart on the grounds asserted by Fabian. If a case falls within the class of cases contemplated by the guideline, it falls within the heartland.

*U.S. v. Koczuk*, 252 F.3d 91, 98 (2d Cir. 2001). There is no case law indicating illegal activities bring a case outside the Hobbs Act heartland. *See Jones*, 30 F.3d at 286 ("It is of no moment therefore that the commodity traveling in interstate commerce is illegal under federal law."). As the district court properly exercised its discretion, we may not review Fabian's sentencing.

## Conclusion

For the reasons given above, we affirm both Fabian's convictions and sentences.

F.I. PARKER, Circuit Judge, dissenting in part.

Although I join most of the majority's opinion, I do not believe there was sufficient evidentiary support for the Hobbs Act conviction on the counts involving the attempted theft of money from the Montoya residence which prevents me from joining the majority's analysis of Counts One and Two. While I agree that this Court requires only a *de minimis* connection with interstate commerce to establish federal jurisdiction under the Hobbs Act, I cannot, on the facts before the Court, infer even such a slight commercial impact from the defendant's involvement in the Montoya situation without extending our existing precedent beyond its logical bounds.

## I.

The Hobbs Act, 18 U.S.C. § 1951 provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in

violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . .

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same States through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951. As the majority clearly recognizes, this Court, while finding proof of an affect on interstate commerce critical to the establishment of federal jurisdiction in a Hobbs Act case, requires only a *de minimis* showing of that affect, recognizing connections to commerce even where the connections are delayed, indirect, or slight. *United States v. Jamison*, 299 F.3d 114, 118 (2d Cir.2002); *United States v. Arena*, 180 F.3d 380, 389 (2d Cir.1999), *cert. denied* 531 U.S. 811, 121 S.Ct. 33, 148 L.Ed.2d 13 (2000); *United States v. Jones*, 30 F.3d 276, 285 (2d Cir.1994). The government must demonstrate only the possibility of an affect on interstate commerce, not an actual affect to meet this standard, *United States v. Shareef*, 190 F.3d 71, 75 (2d Cir.1999), and frequently may establish a tie to interstate commerce even when the conduct creating the affect is illegal, *see, e.g., Jones*, 30 F.3d at 286.

The majority finds little to distinguish the attempted robbery of Montoya's home in Queens, the conduct described in Counts One and Two, from the successful robbery of Veraz's Bronx residence, the conduct described in Counts Three and Four. Noting that, in its view, the goal of the robbery attempt at Montoya's residence was to obtain "drug proceeds," the majority finds that as both drug dealing and loan-sharking have an effect on interstate commerce, Hobbs Act jurisdiction may attach on all four counts. While I would firmly agree with this analysis of Counts One and Two if there were any evidentiary support for the notion that the goal of the attempted robbery had been to obtain "drug proceeds," I·cannot join the majority in good conscience where the evidence at trial showed the goal of the robbery was not to obtain drug proceeds at all.

II.

The majority explains that "Taveras . . . testified he and Fabian intended to steal $300,000 in drug proceeds when they targeted Gomez for robbery." The cited testimony, however, reveals no such intent. Taveras testified as follows:

Q The belief . . . was that the money had been stolen by the guy, you didn't know his name was Montoya, but Montoya had ripped off some drug guys in Florida, is that basically the understanding?

A Yes.

Q So the thieves were going to rip off another thief; is that fair to say?

A Yes.

. . .

Q You were going t[o] rip off one thief by another group of thieves, that was it?

A Yes, sir.

As the testimony shows, the intent of the robbers was not to obtain the proceeds of a drug deal as the majority's label seems to imply, but rather to obtain the proceeds

of a theft.[1] While the victims of the original theft may have been Miami drug dealers, the defendants viewed the money in Montoya's hands not as "drug proceeds" but as "robbery proceeds." On this seemingly minor distinction, the jurisdiction in this case turns.

This Court has found that the robbery of a potential purchaser of drugs depletes the assets of the purchaser and prevents completion of the drug transaction, thereby affecting interstate commerce. *Jones*, 30 F.3d at 285. Similarly, it has found that the robbery of an individual illegally trafficking cocaine from his home depletes the "working capital" of the cocaine operation and thus affects the individual's continued participation in (albeit illegal) interstate commerce. *Jamison*, 299 F.3d at 121; *see United States v. Parker*, 165 F.Supp.2d 431, 464–65 (W.D.N.Y.2001) (finding impact on interstate commerce under *Jones* where defendants conspired to rob and extort money from persons they believed to be drug dealers); *see also United States v. Peterson*, 236 F.3d 848, 855 (7th Cir. 2001) (rejecting Hobbs Act jurisdiction when government failed to demonstrate that robbery of victim's marijuana trade involved drugs that originated out of state). Nevertheless, neither this Court, nor any other court, has found that a robbery of a person who robbed a drug dealer may support a similar depletion-of-assets theory. The secondary robbery does not in any way deplete the assets of the originally victimized drug dealer so as to create an impact on interstate commerce justifying Hobbs Act jurisdiction. The first robbery has already done that.

Nor does the second robbery independently impact interstate commerce purely through depletion of the previously successful robber's illegally gained assets.

Although this Court has found that interference with interstate trade in narcotics, while illegal, may impact interstate commerce, it has not made a similar finding that interference with interstate robbery is itself a basis of Hobbs Act jurisdiction. The Fifth and Sixth Circuits have found Hobbs Act jurisdiction based on the robbery of an individual's assets only where the individual robbed is a regular actor in interstate commerce or can be specifically shown to have intended to use the funds stolen for interstate commerce, where the robbery forces the victim to deplete the assets of an interstate entity (for instance a bank) to compensate for the crime, or where the amount of money or number of people affected is so large as to have an inevitable interstate impact. *See United States v. Turner*, 272 F.3d 380, 387 (6th Cir.2001) (examining robbery of home of an operator of an illegal gambling operation); *United States v. Collins*, 40 F.3d 95, 100 (5th Cir.1995) (examining robbery of individual who worked for an interstate corporation). The defendants' objective in this case—to steal money they believed Montoya had himself stolen—does not fit any of these guidelines. The government did not successfully demonstrate that Montoya was a regular actor in interstate commerce, that he intended to use the stolen funds in interstate commerce, or that he would seek to "compensate" for the loss of funds by turning to a bank or other financial institution for relief.[2] The government

---

1. Notably, Taveras testified further that the defendants planned to pretend they were police officers investigating the Miami robbery when they presented themselves to Gomez.

2. Taveras agreed on cross-examination that the defendants believed Montoya would be

unable to take action after the robbery because he was incarcerated and that his wife, Gomez, would not alert anyone, much less seek to replace the funds, because she would be unable to account for the presence of the money.

also failed to show that the amount of money targeted was sufficiently large to have an inevitable impact on interstate commerce. Furthermore, even if interference with interstate robbery, like interference with interstate drug dealing, were considered interference with interstate commerce under the Hobbs Act, the government presented no evidence that the theft of the proceeds of Montoya's recent robbery would somehow deplete the assets of Montoya's robbery operation, crippling his ability to rob other victims, drug dealers or otherwise, in the future.

The majority attempts to avoid these potential hurdles by citing this Court's decision in *United States v. Rosa*, 17 F.3d 1531, 1546 (2d Cir.1994) for the principle that a "jurisdictional nexus for federal prosecution" for conspiracy is established where any member of the conspiracy believes the targeted goods were traveling from out of state. Even if *Rosa*, a case concerning conspiracy to receive stolen goods, were determinative of the jurisdictional rules for the Hobbs Act, the majority neglects the absence of a "good" from which to derive interstate movement in this case. In the belief of Fabian and the others attempting the robbery, the only thing that moved interstate, was the money Montoya supposedly stole from Miami drug dealers. As the Seventh Circuit has explicitly stated, however, the fact that money involved in a crime has traveled across state lines cannot alone support a finding of Hobbs Act jurisdiction. *See Peterson*, 236 F.3d at 853 (citing *United States v. Paredes*, 139 F.3d 840, 844 n. 3 (11th Cir.1998)). Without evidence that the robbery of Montoya's assets would deplete the assets of a business or individual involved in interstate commerce, the fact that the money targeted allegedly originated in Miami cannot support a finding of Hobbs Act jurisdiction. Simply put, the government failed to show that the at-tempted robbery of an alleged robber affected interstate commerce within the meaning of the Hobbs Act. In the face of such a failure, the majority's attempt to dismiss the attempted robbery as an attempt to obtain drug proceeds is a dangerous oversimplification of the facts and a dramatic extension of the law.

### III.

The majority hinges Hobbs Act jurisdiction on the defendants' pre-attempt belief that they were about to steal "drug proceeds." The defendants, however, expressed their belief in quite another way:

Q So the thieves were going to rip off another thief; is that fair to say?

A Yes.

. . .

Q You were going t[o] rip off one thief by another group of thieves, that was it?

A Yes, sir.

The attempted robbery in this case did not target the proceeds of a drug deal or the assets of a drug dealer. It instead targeted the money of a person the intended robbers believed to be a thief. Although the victim of the attempted robbery (Montoya) had himself potentially interfered with interstate commerce by depleting the assets of Miami drug dealers, the attempted robbery of Montoya did not further deplete the assets of Montoya's original victims. Furthermore, as explained above, the depletion of Montoya's assets had no independent impact on interstate commerce.

The majority calls the money targeted in the attempted robbery "drug proceeds." Absent this misnomer, however, the majority's analysis of Counts One and Two fails. Uncomfortable skimming over the secondary nature of the defendants' attempted

robbery and unwilling, without comment, to declare robbing a robber a federal crime, I respectfully dissent.