**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 10 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

FRED L. HOLDER,

      Defendant - Appellant.

No. 00-7133

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 00-CR-2-S)**

---

Stephen Jones, Enid, Oklahoma, for Defendant-Appellant.

Dennis Fries, Assistant United States Attorney, Oklahoma City, Oklahoma (Sheldon J. Sperling, United States Attorney for Oklahoma, and Jeffrey A. Gallant, Muskogee, Oklahoma, with him on the brief), for Plaintiff - Appellee.

---

Before **BRORBY**, **PORFILIO** and **MURPHY**, Circuit Judges.

---

**PORFILIO**, Senior Circuit Judge.

---

While awaiting trial in state court for first degree murder, Fred Lloyd Holder was charged in the Eastern District of Oklahoma with murder in violation of 18 U.S.C. § 1111(a) and § 1114(1); and assaulting, resisting, or impeding a federal officer in violation of 18 U.S.C. § 111. A jury convicted Mr. Holder of both counts. Although he persists in challenging our jurisdiction, this appeal, in fact, turns upon the sufficiency of the evidence supporting his conviction. We affirm.

## A. Background

The Natural Resources Conservation Service (Service) of the United States Department of Agriculture (Department) administers the Wetlands Reserve Program, through which the Department purchases land to be placed into perpetual easements intended to restore, protect, manage, and enhance wetlands. While retaining certain rights and recreational uses, like hunting and fishing in the easement, the landowner is prohibited from haying and mowing; altering the grassland; dumping refuse; cutting timber; draining or diverting surface or underground water; planting or harvesting crops; placing buildings on the easement; and "grazing or allowing livestock on the easement area." Exhibit 4, Warranty Easement Deed.

Of the several programs for which he is responsible, Kenneth Swift, a Service District Conservationist, administers the Wetlands Reserve Program in southeastern Oklahoma and reports to Ronnie L. Clark, the Service's State Conservationist in Stillwater, Oklahoma. In this capacity, Swift oversaw the Department's sale of a 2,220

acre wetlands easement in February 1998 to a limited partnership of outdoors enthusiasts (BC Partnership or BC Partners), Larry Manning, Kenny Klug, Lacy Hartborne, Beau Purvis, and David Pickens, who named the venture the BC Wetlands. From the outset, David Pickens, described by Swift as the group's "point man," met with Swift to discuss the management of the property according to the terms of the federal government's easement. Of chief concern were cattle which wandered onto the property from neighboring land owned by Clara Holder and her son, Fred.

Larry Manning, a BC Wetlands partner, visited Fred Holder on six occasions explaining how the cattle continued to migrate through dilapidated fencing onto the BC Wetlands. In response, Holder gave his assurance he would remove them. Weeks later with the cattle still on the BC Wetlands, Manning again visited Holder who eyed him "across the gate [and] . . . said, "Boy, I'll catch you on the back of that place, I'll hang your ass from a tree." Later that spring while plowing with Manning, David Pickens confronted Holder at the BC Wetlands' boundary. Holder, reacting to Pickens' demand to remove the cattle, asked, "Why don't we shoot it out?"

When words failed to persuade Fred Holder, David Pickens met with Swift to express his frustration, cataloging specific grievances: expenses the BC Partners incurred to replace gates and chain and lock them, only to find the chains and locks cut; the discovery of a bulldozer with its tracks leading to a culvert submerged in Tanyard Creek to permit crossing; and finding 30 acres of timber clear-cut and hauled away from the BC

Wetlands. In fact, in April 1998, Kenneth Swift sent David Pickens a letter notifying the

BC Partnership of its violation of the Wetlands Reserve Program easement provisions and

explaining their failure to remove the livestock "shall result in potentially severe

penalties. You may and will be responsible for all expenses incurred by the United States

(including any legal fees or attorney fees). This conceivably could involve

reimbursement for easement costs, restoration expenses and legal cost, which could

approach one million dollars."[1]

In September 1998, David Pickens wrote Ronnie Clark, the Department's State

Conservationist, detailing the BC Partnership's problems with Fred Holder. He stated:

> Initially, we simply asked the man to remove his cattle, and we gave him a key to our gate to allow him access to the property to do this. We then were made aware that not only was he not removing the cattle, but he was allowing more cattle onto the land. We have contacted the Choctaw County Sheriff's department at least 30 times. We have also contacted the County Attorney at least a dozen times. We have discovered through these contacts that they are either unwilling or not able to assist us in our efforts.[2]

---

[1]Mr. Swift also wrote:

> The presence of the livestock on the easement is in direct violation of the said easement. I, as a representative of the Natural Resources Conservation Service, have verbally requested the removal of the livestock from the easement area by your group on several occasions. I realize the livestock may not be your personal property, but you, as the current owners, assumed the conditions of the easement upon purchase of the property. This requires you to remove the livestock immediately or be in violation of the terms of the easement.

[2]At trial, Kenny Klug, a BC partner, testified the BC Partners hired three cowboys

(continued...)

This man verbally threatened the life of one of our partners. In another incident Holder pulled a gun on one of our other partners. We are represented by [attorneys] who sent Holder a certified letter asking him to remove the cattle. We have filed and received a Temporary Restraining Order, which has been violated no less than 20 times, and we have filed a civil lawsuit. Obviously, our efforts have been completely ignored because as of yesterday, there remains at least 250 head of cattle on the property.

Pickens also told Clark the recent rains exacerbated the damage the cattle caused and, while the BC Partners had legal recourse to remove the livestock themselves, they would then have to shoulder the expense of holding the cattle until judgment and repayment, perhaps a protracted time given Fred Holder's claim of adverse possession on some of the property.

Clark responded, telling Pickens that after discussing the problem with the Wetlands Reserve Program National Manager in Washington, D.C., and the Regional Attorney for the Office of General Counsel in Temple, Texas, the Service "plan[s] to construct a fence within the WRP [Wetlands Reserve Program] easement property. The fence will be a well-constructed barbed wire fence meeting NRCS standards and specifications. All costs of materials and construction will be federally funded through WRP."[3]

---

[2](...continued)
to help them move the cattle. When the cowboys learned the cattle belonged to Fred Holder, they refused the work.

[3]On June 14, 1999, Ronnie Clark wrote Ms. Clara Holder notifying her of the Service's plan "to construct a barbed wire fence along the common boundary between your property and our Wetlands Reserve Program (WRP) easement property." He

(continued...)

To that end, on September 23, 1998, David Pickens met Swift at the north end of the easement and the two traveled by four-wheeler to flag an old fence line on the southeast corner where the surveyor had completed his work. After two hours, they finished this fence section and crossed Tanyard Creek, planning to head back north to continue flagging fence line. Within two hundred yards of the four-wheeler, David Pickens spotted two men on horseback. Pickens handed Swift the video camera he carried to record the flagging and old fence row and undid his belt, removing a leatherman tool and the .22 caliber pistol he carried in a holster.[4] Pickens slid the holster under his waistband in the small of his back and worked his belt through the loops, instructing Swift to stay back.

Pickens, on foot, approached the riders, his back to his companion. When Swift looked up, he saw Fred Holder cradling a shotgun pointed at David Pickens. Although their words were baffled by Pickens' body, Swift saw David Pickens reach for the gun tucked into his waistband. As he fumbled, Swift heard Fred Holder yell, "I told you never pull a gun on me again," and Holder's shotgun blast enveloped David Pickens, standing

---

[3](...continued)
informed Ms. Holder that surveyors would be on the property "to insure that the fence is constructed on WRP easement property" and to stake the easement boundaries. Ms. Holder's attorney responded to Mr. Clark, stating that although his client had no objection to the survey, the present fences reflected her claim to property by adverse possession.

[4]Pickens and other BC Partners usually carried a firearm to shoot snakes and beaver while on the BC Wetlands.

ten feet in front of the muzzle. His right arm swinging in a wide arc, Pickens fell backwards as Fred Holder pumped another round into the chamber and leveled the shotgun at Kenneth Swift.

Swift raised his hands, telling Holder he was unarmed, identifying the object slung over his shoulder as a video camera, not a weapon. Dropping the camera to the ground, Swift asked Holder if he could approach David Pickens. With Holder's shotgun tracking him, Swift went to Pickens, who lay on his back gasping, the shotgun blast having torn a hole in the base of his neck. Swift asked Fred Holder and his companion to go for help. Still pointing the shotgun at Swift, Holder refused, explaining, "Someone will shoot me if I get on the other side of that fence." Despite Swift's assurance he was the only one left on the BC Wetlands, Holder declined and rejected Swift's request for a ride two miles north where his pickup was parked so that he could go for help. Swift asked if he could take the four-wheeler, parked nearby, but Holder answered, "No, it had a gun on it." Although Swift offered to remove the gun, Holder rebuffed him, relenting only when his companion asked, "Why don't you let him take the four-wheeler to go get some help?" Holder told his companion to keep an eye on David Pickens and walked his horse along the fence line, the shotgun pointed at Swift as he ran to the four-wheeler. Swift then drove north to a neighboring house and called the sheriff.

The District Attorney of Choctaw County filed an information charging Fred Holder with first degree murder in violation of 21 Okla. Stat. § 701.7(A), and, after a

hearing, a state judge released him on bond with the condition Holder not "enter upon any property of this particular neighbor, B.C. Wetlands."[5]  Four months later, a federal grand jury in the Eastern District of Oklahoma charged Fred Holder in a two count indictment with violating 18 U.S.C. §§ 1111(a) and 1114(1) for the first degree murder of David Pickens "while David Pickens was assisting Kenneth Swift, an employee of the federal government, while Kenneth Swift was engaged in and in performance of his official duties as an employee of the United States government;" and forcibly assaulting, resisting, opposing, impeding, intimidating and interfering with Kenneth Swift, "in his official capacity as an employee of the United States government, while Kenneth Swift was engaged in the performance of his official duties" in violation of 18 U.S.C. § 111.  Holder moved for a judgment of acquittal after the government's case in chief and for dismissal after his conviction, both motions based on his contention federal jurisdiction was lacking.

He persists here in that perspective, fashioning the underlying plot to involve the killing of one "private citizen" by another on "private property."  In this setting, Kenneth Swift may have performed some official duties, but those tasks were fully completed when David Pickens stepped out of his role assisting this federal officer and engaged in a "personal frolic" which precipitated the shooting.  Under this reading, although there may

---

[5]In setting the condition, the judge acknowledged he did "not feel comfortable in restricting Mr. Holder on his own property, from traveling about his own land."

have been an unlawful killing, Oklahoma's law, not narrowly circumscribed federal law, must govern.

## B. 18 U.S.C. §§ 111 and 1114

Congress has extended federal criminal jurisdiction to *whoever* assaults a federal officer "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a).[6] Those protected by § 111(a) are enumerated in 18 U.S.C. § 1114.[7] In 1996, Congress amended § 1114, replacing those enumerated officers and employees with the general reference, "any officer or employee of the United States or of any agency in any branch of the United States Government . . . or any person assisting such an officer," and qualifying the list with language that mirrors § 111(a), "while engaged in or on account of the performance of official duties." 18 U.S.C. § 1114. Of the criminal liability created in 18 U.S.C. § 111, the Supreme Court has found "it plain that Congress intended to protect *both* federal officers and federal functions . . . [and] insure a federal forum for the trial of

[6]18 U.S.C. § 111 states, in part:
>  (a) In general. - Whoever -
>>  (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . .

[7]18 U.S.C. § 1114 states:
>  Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished . . . .

offenses involving federal officers." ***United States v. Feola***, 420 U.S. 671, 679, 683-84 (1975) (emphasis in original). Entrusting that responsibility to a federal forum was "a matter essential to the morale of all federal law enforcement personnel and central to the efficacy of federal law enforcement activities." ***Id.*** at 685 n.18. Thus, "[t]hat the 'federal officer' requirement is anything other than jurisdictional," is implicit in § 111. ***Id.*** at 676 (footnote omitted).

Nevertheless, § 111 does not set forth what constitutes "official duties," and courts construing this language agree "[t]here is no bright-line test to define performance of . . . official duties." ***United States v. Hoy,*** 137 F.3d 726, 729 (2d Cir. 1998), quoting ***United States v. Hoffer***, 869 F.2d 123, 125 (1989). While time and place may be dispositive in one case, in another, the mission may override in the court's analysis. ***United States v. Boone,*** 738 F.2d 763, 765 (6th Cir. 1984) (per curiam). Thus called "inherently fluid," ***id.***, the resulting test courts have employed in these cases focuses on whether the federal agent is "simply acting within the scope of what the agent is employed to do. The test is whether the agent is acting within that compass or is engaging in a personal frolic of [his] own." ***Hoffer***, 869 F.2d at 126, quoting ***United States v. Heliczer***, 373 F.2d 241 (2d Cir. 1967); *see also* ***United States v. Clemons***, 32 F.3d 1504, 1507 (11th Cir. 1994).

Consequently, whether the federal officer wears a uniform, badge, or other identifying credential is not an essential component of the test. Nor is location or work assignment. Assailants have faced criminal liability under §§ 111 and 1114 when they

assaulted an off-duty park ranger enforcing park rules, ***United States v. Hohman***, 825 F.2d 1363 (9th Cir. 1987); an off-duty DEA officer getting a haircut and overhearing a robbery in progress, ***United States v. Reid***, 517 F.2d 953 (2d Cir. 1975); an IRS agent repossessing a car, ***United States v. Streich***, 759 F.2d 579 (7th Cir. 1985); a federal judge walking to the federal courthouse on a Sunday evening to research a case, ***Boone***, 738 F.2d at 763; a federal agent detaining a state-charged suspect, ***United States v. Lopez***, 710 F.2d 1071 (5th Cir. 1983); and an off-duty deputy U.S. Marshal arresting a suspect after coming upon a street fracas, ***Hoy***, 137 F.3d at 726. Each of these cases illustrates the fluidity of "while engaged" and refuses to cage "official duties" either with a rigid time line or highly circumscribed activity. Moreover, "Congress has apparently made no attempt to circumscribe these holdings." ***Id.*** at 730.

Thus, in ***Hoy,*** a deputy U.S. Marshal deployed from Tucson to New York City to provide security during the World Trade Center bombing trial, happened upon a woman whose purse was snatched. The assailant returned, the Marshal intervened, precipitating a serious punch thrown at the federal officer, and the matter was prosecuted in federal court where defendant argued that an off-duty federal officer in another venue and walking home cannot be "engaged in or on account of the performance of his official duties." 136 F.3d at 728. The Second Circuit refused to distinguish between whether the Marshal's Service "authorized" or "expected" the particular intervention. Instead, it stated, "[t]he scope of what the agent is employed to do is not defined by whether the officer is abiding

by laws and regulations in effect at the time of the incident, nor is the touchstone whether the officer is performing a function covered by his job description." *Id.* at 731. "It seems clear from the governing policy that a deputy marshal is expected and authorized to intervene in certain limited circumstances, especially where there is harm or a threat of harm as a consequence of the violation of state law." *Id.* This disposition drew from Second Circuit precedent which held "the word 'duties' in section 111 should be liberally construed 'in terms of what the officer ought to do because of being an officer.'" *Id.* at 730, quoting *Reid*, 517 F.2d at 964.

Although we have not previously construed the scope of §§ 111 and 1114,[8] our discussion in *United States v. Martin*, 163 F.3d 1212, 1214 (10th Cir. 1998), presages the result here. In *Martin*, we looked to § 111 precedent to decide whether a local police detective deputized to participate in federal narcotics investigations is a federal officer within the meaning of 18 U.S.C. § 115(a)(1)(B),[9] a question deemed one of first impression in this Circuit. The court rejected defendant's efforts to cut off liability because the threats to kill the officer were made much earlier when the police detective

---

[8]In *United States v. Treff*, 924 F.2d 975 (10th Cir. 1991), the court affirmed a conviction under § 111 although defendant did not challenge the status of the victim, an IRS official. In *United States v. Slaughter*, 445 F.2d 286 (10th Cir. 1971), and *United States v. Hodges*, 436 F.2d 676 (10th Cir. 1971), defendants assaulted federal prison officials but did not raise the question of the scope of § 111 in their appeals.

[9]18 U.S.C. § 115(a)(1)(B) makes it a crime to "threaten [] to . . . murder . . . a Federal law enforcement officer, or an official whose killing would be a crime under [18 U.S.C. § 1114]."

worked on the federal investigation before he ceased working for the FBI.  Actions done in retaliation for official duties even after official duties are completed remain protected by § 115, the court stated, deriving this result from § 111.

With this foundation, we embrace the analyses of our sister Circuits which interpret liberally and with flexibility the plain meaning of "while engaged or on account of the performance of official duties" in § 111 and § 1114.  Each case, thus, requires a fact specific analysis, but no case will turn on any one factor.  While the rules, regulations, handbooks and manuals of the various federal services will help to define those "duties," we recognize each particular set of facts and circumstances must govern to decide whether the assault on the federal officer occurs within "the compass" of his or her official responsibilities.[10]  *Hoffer*, 869 F.2d at 126.

The identical analysis applies to the subsidiary question involved in whether federal criminal liability protects "any person assisting such an officer or employee."  Defendant triggered that analysis in *United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994), when he contended a local jailor assisting in his transfer to a county jail with which the U.S.

_____

[10]Although he acknowledges the 1996 amendment of § 1114, Holder continues to insinuate the statute principally protects individuals connected to federal authority by virtue of law enforcement responsibilities.  In support, he cites a Justice Department manual for the proposition that its primary enforcement responsibility targets employees with "law enforcement duties which regularly expose them to the public."  *See* The Department of Justice Manual, 2d ed., vol. 3, title 9-349, § 9-65.611(2000).  However, the Justice Department manual lacks the force of law.  *United States v. Navarro*, 160 F.3d 1254, 1257 n.4 (9th Cir. 1998) (citation omitted).  While the passage may express DOJ policy, it has no effect on our statutory analysis of § 1114 or our resolution of this case.

- 13 -

Marshal Service contracted was not protected by §§ 111 and 1114. Reciting the predicate tenets of statutory construction, the court observed the term "'employed'[11] has a broad sweep and is expansively used: 'employ' means 'to make use of,' 'to use advantageously' . . . . '[A]ssist' means 'to give support or aid.'" ***Id.*** at 145, quoting Webster's Ninth New Collegiate Dictionary, 408 (9th ed. 1990). Thus, "[t]he common usage of 'employed to assist' means that a person is being used to help a federal agent, and that is exactly what transpired in this case." ***Id.*** The court concluded §§ 111 and 1114 permits prosecution in federal court of a state employee "employed to assist" a federal marshal. *See also **United States v. Chunn***, 347 F.2d 717, 721 (4th Cir. 1965) (undercover state agent on loan to the IRS and assisting federal agents is a federal officer for purposes of § 111).

The Second Circuit expanded the reach of "assisting" to protect a handyman employed by a private company to install wallboard in a single-room occupancy hotel (SRO), a "beehive of narcotics-related activities," seized by the federal government in civil forfeiture proceedings. ***United States v. Matthews***, 106 F.3d 1092, 1093 (2d Cir. 1997). Matthews, a tenant in the hotel, pulled a knife on one of the workers who, he thought, was installing the wallboard inside out. To his objection to federal jurisdiction under §§ 111(b) and 1114, the Second Circuit noted, "True, a handyman doing repairs at an SRO is not the person or the role intuitively associated with these statutory protections

---

[11]Pub. L. 104-132, § 727(a), H. R. Conf. Rep. No. 518, 104th Cong. 2d Sess., 1996 U.S.C.C.A.N. 956, notes the modifications to section 1114, which also replaced "employed to assist" with the language "any person assisting such an officer."

- 14 -

for federal officers." *Id.* at 1096. Nonetheless, the court concluded "*this* handyman in *this* SRO was 'employed to assist' the Marshals Service," based on the government's seizure of the SRO as "a measure to abate rampant and prolonged lawlessness." *Id.* at 1096-97 (emphasis in original). Emptying the building was essential to "exert pervasive control over the premises . . . . For that purpose, the Marshals Service could deploy its own employees, hire additional people, or (as it did) contract with a private firm." *Id.* Thus, this handyman encountered risks not commonly experienced by other hotel workers and was consequently "employed to assist" federal officers.

Given the reach of these two statutes to protect federal officers and anyone assisting federal officers "while such officer or employee is engaged in or on account of the performance of official duties" and to provide a federal forum, Holder's contention the federal court lacked jurisdiction over his prosecution must simply be addressed as a challenge to the sufficiency of the evidence. We, then, turn to the evidence the jury relied upon to conclude David Pickens was murdered while assisting Kenneth Swift, a Department official engaged in the performance of his official duties, and Swift was assaulted, intimidated, or interfered with while engaged in or on account of the performance of his duties as Service District Conservationist.

### C. Sufficiency of the Evidence

To fulfill this appellate task, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential

- 15 -

elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, for conviction, the jury had to decide the ultimate issues of fact: whether Swift, a Service employee, was present on the BC Wetlands "engaged in or on account of" his "official duties" to supervise the Wetlands Reserve Program, when Fred Holder interfered with that task; and whether David Pickens was "assisting" Swift to flag the BC Wetlands' boundary when Fred Holder shot him.

Although defense counsel would obfuscate the evidence the government introduced with a bloviated discourse on the history and nature of this private property dispute,[12] the *facts* introduced at trial fulfilled each element of the government's burden to prove a violation of these statutory sections. As already noted, David Pickens was Swift's "point man" in communicating the Service's requirements for managing the BC Wetlands. Swift testified he had conversations and sent a letter to David Pickens communicating the liability the BC Partnership faced if it failed to remove the cattle from the easement. Of course, David Pickens is a private citizen as Holder stresses, but as a wetlands owner, he was obligated to fulfill the requirements he had undertaken when he purchased the

_____

[12]Indeed, although Ms. Holder apparently believed she was the rightful owner of certain disputed land bordering the BC Wetlands by virtue of her 18-year adverse possession of that area, she never sought a judicial determination of her claim. Nonetheless, the Service flagged the old fence line which bounded her claim and, where an area was disputed, Swift testified, he moved the boundary over onto the BC Wetlands to avoid any disputes.

property encumbered with a Department wetlands easement.[13]  Swift's supervisor, Ronnie

Clark, instructed Swift to construct a fence "meeting NRCS standards" at government

expense to resolve the impasse the BC Partners faced in fulfilling the easement

requirement prohibiting cattle on the BC Wetlands.  On the day of the shooting, Pickens

and Swift were on the BC Wetlands completing the preliminary flagging for that fence.

That task, contrary to defense counsel argument, did not end the instant Swift placed the

last marker on the fence line; nor would it have ended once he and Pickens mounted the

four-wheeler to leave that area or to drive to another area.  As the cases illustrate, "while

engaged" realistically embraces the sequence of steps involved in any task "on account of"

the official's performance of his duties.[14]  Swift's responsibilities as a guardian of that

wetlands devolved upon him because of his employment with the federal government.  To

describe that context as "secondary" to defense counsel's scenario of an "ongoing property

dispute . . . going on for quite some time" ignores the essential facts that brought David

---

[13]In his testimony, Swift described the federal wetlands program as a "cost-share" program.  The Wetlands Reserve Program envisions a shared responsibility between owners of federal wetlands easements and the federal government.  Thus, its requirements run with the easement.  Consequently, although a "private citizen," David Pickens was surely an alter ego of the Wetlands Reserve Program, required to enforce its conditions or face considerable financial penalties.

[14]There are limits, of course.  The **Matthews** court rejected the government's argument which essentially removed any limits on "assisting" under §§ 111 and 1114. "For example, the government's reading would cover a mechanic on a road call, en route to repair a Marshals Service car, who is punched by another motorist in a traffic dispute. Maybe these statutes can be stretched that far, but we doubt it."  **United States v. Matthews**, 106 F.3d 1092, 1096 (2d Cir. 1997).

Pickens and Ken Swift onto the land in the first instance: lawful orders from federal officers empowered to protect federally designated wetlands.

The jury heard both versions and concluded beyond a reasonable doubt Fred Holder unlawfully killed David Pickens while he was assisting Ken Swift, a federal employee, engaged in the performance of official duties; and interfered and intimidated Ken Swift while performing those duties. We therefore **AFFIRM** the convictions. Further, the government's motion to supplement the record is denied.