FILED
United States Court of Appeals
Tenth Circuit

September 19, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

FRED LLOYD HOLDER,

    Defendant - Appellee.

No. 06-7071
(D.C. Nos. CIV-02-556-FHS and
CR-00-002)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **LUCERO** and **HARTZ**, Circuit Judges.

On October 8, 2002, Fred Holder filed a petition for habeas relief under 28

U.S.C. § 2255, alleging claims of ineffective assistance of counsel with respect to

his convictions for murder in the second degree in violation of 18 U.S.C. §

1111(a) and for assaulting, resisting, or impeding a federal officer while in the

performance of official duties in violation of 18 U.S.C. § 111. The district court

denied this motion without a hearing, and Holder appealed. In United States v.

Holder, 410 F.3d 651 (10th Cir. 2005) ("Holder II"), we reversed the denial of

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

Holder's § 2255 motion and remanded for an evidentiary hearing. Upon remand, the court held a hearing in which Holder's trial counsel testified. On June 21, 2006, the court granted Holder's motion for § 2255 relief with respect to both counts of conviction.[1] The government now appeals the grant of habeas relief with respect to the second degree murder conviction. Assuming jurisdiction under 28 U.S.C. § 1291, we **AFFIRM**.

## I

We have previously recounted the factual history of this case in some detail. See United States v. Holder, 256 F.3d 959 (10th Cir. 2001) (affirming Holder's conviction on direct appeal) ("Holder I"); Holder II, 410 F.3d 651 (reversing the denial of Holder's § 2255 motion and remanding for an evidentiary hearing). We set forth the facts of this case and its procedural history as they pertain to Holder's ineffective assistance of counsel claim.

## A

In the late 1990s, the BC Wetlands Partnership, a group of duck hunting enthusiasts, purchased an easement that allowed them to conduct limited recreational activities on a federal wetlands parcel. Kenneth Swift, a federal

---

[1] The district court also granted habeas relief on separate grounds for Holder's conviction for assaulting, resisting, or impeding a federal officer while in the performance of official duties in violation of 18 U.S.C. § 111. In its brief before this court, the government does not set forth any argument against the grant of habeas relief with respect to Holder's conviction on this count. We hold this issue waived. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

employee of the Natural Resources Conservation Service, oversaw the sale of this easement. Holder's family owned property adjacent to the wetlands parcel, and used their property to raise cattle.

Because livestock were forbidden on the wetlands under the terms of the easement, BC Wetlands partners, including David Pickens, sought to prevent Holder's cattle from entering the parcel. These attempts caused serious disagreement between Holder and the BC Wetlands Partnership. In response to the cattle problem, the Natural Resources Conservation Service agreed to construct a fence along the property line. On September 23, 1999, Pickens accompanied Swift on a four-wheeled vehicle and began marking the property boundary with flags in preparation for construction. While engaged in this task, Swift and Pickens spotted two men on horseback. Recognizing one of the men as Holder, Pickens told Swift to stay behind him. Pickens had a pistol in his holster, which he slid to his back before approaching the pair on horseback. What happened next is disputed.

At trial, Holder testified that he was hog hunting on his property with George David Smith on that same day. Holder stated he was carrying a shotgun with him, and removed the gun from its scabbard prior to his encounter with Pickens because he was afraid it would fall out while he was crossing a creek. When Holder encountered Pickens, the two had a conversation in which, according to Holder, Pickens kept "a rambling and a raging and slinging his hands

and cussing." Holder could see that Pickens had a gun. During the conversation, Holder testified, he stood across from Pickens and kept his gun pointed "down towards the ground." At some point, Pickens began to move his hand toward his pistol, and Holder told him, "Fellow, don't you go for that gun." When Pickens continued to move his hand "faster" toward the gun, Holder stated that he loaded a shell into his shotgun. According to Holder, Pickens then proceeded to remove his pistol from its holster and pointed it at Holder. Only then, Holder testified, did he fire a shot at Pickens. Holder explained to the jury that he did so because he was afraid "[Pickens] was going to kill me."

Swift's testimony at trial differed from Holder's in important respects. Swift testified that when he saw Holder and Pickens arguing about thirty feet away from himself, Holder was already pointing a shotgun at Pickens. At some point during the argument, Pickens began to fumble for his pistol, which was located toward the center of his back. According to Swift, Holder then yelled, "I told you never pull a gun on me again," and shot Pickens. Swift clearly stated before the jury that Pickens "never got [his] gun out of the holster" before Holder fired.

Smith, the third and final witness to the shooting, was not called to testify at trial. In his testimony before the grand jury, Smith corroborated much of Holder's version of events. Smith testified that he was hog hunting with Holder on the morning of the shooting. While on horseback, the two men came across a

four-wheeled vehicle. Smith told the grand jury that Holder's gun had been in a scabbard shortly before this point. He guessed that Holder pulled the gun out of the scabbard either around the time they passed the four-wheeled vehicle or afterwards, but testified that he did not know for sure when Holder drew the gun. Soon after seeing the four-wheeled vehicle, Holder and Smith encountered Pickens and Swift. Smith, who was riding ahead of Holder, first exchanged greetings with Pickens. Immediately afterwards, Holder spoke up and accused Pickens of cutting Holder's fences. Smith testified:

> And then right after that, just kind of as soon as [Pickens] said, no, I didn't, I seen him reach with his right hand back. And then there was a little bit of a hesitation, I don't know what, and then he jerked out a gun. I don't know if his arm was extended. And just as soon as he jerked it out – it all happened just like that – Fred shot. It just happened just like that.

Later in his grand jury testimony, Smith confirmed that he saw Pickens' pistol come out of the holster before Holder fired. According to Smith, "[Pickens] reached kind of slow and then there was a hesitation. That's – that's kind of – just a hesitation for a moment. And then he come out and then [Holder's shotgun] shot." Smith also testified that he did not hear Holder load his shotgun prior to shooting Pickens. When the government asked, "So . . . the shell was already in the barrel ready to fire?" Smith responded, "I would say so. I know that may look bad but I didn't hear it."

At several points in his testimony before the grand jury, Smith expressed his view that Holder acted in self defense. He stated, "Fred [Holder] done the only thing, in my belief, that he could have done. And I believe that with all my heart. I believe if Fred hadn't have shot, I believe he could be the one that's dead right now." At another point, Smith testified, "I believe if Fred hadn't have fired, he could have been the one dead and maybe me too."

Holder was charged in federal district court with first degree murder of an individual assisting a federal employee in the performance of his duties, and intimidation of a federal employee with a deadly weapon. See 18 U.S.C. §§ 1111(a), 1114(1), 111. Holder admitted to shooting Pickens, but claimed that he did so out of fear for his own life. Thus, the central issue at trial was whether Holder shot Pickens in self-defense. As previously noted, Smith was not called to testify. During the trial, the government described the case as a "swearing match" between Holder and Swift, and stated during closing argument:

> Ladies and gentlemen, this case really does boil down to this. Do you believe Ken Swift or do you believe the defendant?

> If you believe Ken Swift, then the defendant is guilty because the gun never came out and the defendant shot him in cold blood.

Urging the jury to believe Swift, the prosecutor then asked the jury, "[W]ho has a reason to fabricate a story to you and lie? . . . It's between Ken Swift and the defendant. Who has the motive to lie?"

**B**

Holder was convicted by the jury of obstructing a federal officer and of second degree murder, and was sentenced by the lower court to 168 months' imprisonment. We affirmed his conviction on direct appeal. Holder I, 256 F.3d 959. Holder then filed a 28 U.S.C. § 2255 habeas petition alleging ineffective assistance of counsel, which the district court denied without a hearing. Holder appealed this denial. Holder II, 410 F.3d 651.

In Holder II, we held, based on our review of the trial transcript, that "Holder has carried his burden to 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" 410 F.3d at 655 (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)) (additional internal quotations omitted). We explained, "The potential for the testimony of Smith to have tipped the balance in favor of a finding of self-defense is apparent under the circumstances here, where his testimony, if believed, would have bolstered that of the defendant and refuted that of the prosecution's witness, Swift." Id. at 655. Moreover, because "the jurors knew of Mr. Smith's presence at the scene, as it had been mentioned by both Swift and Holder . . . . his absence from trial surely must have been noticed." Id. at 656. We remanded for an evidentiary hearing on Holder's ineffective assistance of counsel claim with the following guidance to the district court:

> Our record offers no explanation for counsel's decision not to call
> Mr. Smith. There may have been sound, tactical reasons not revealed
> by the record. But on this record we cannot rule out other

-7-

possibilities, such as that there may have been no reason at all but instead a failure to investigate which left counsel unfamiliar with Smith's version of the events, or a failure to secure Smith's appearance at trial. Such a crucial decision must be explained before a court can draw any conclusions on the ineffectiveness claim.

Our disposition is compelled, we conclude, by the totality of the circumstances before us. The crucial issue in the trial of the murder charge was the credibility of conflicting testimony of two witnesses and the weighing of their testimony in the circumstances of the tragic confrontation resulting in the death of Mr. Pickens. We are convinced that the circumstances made critical the holding of an evidentiary hearing to develop the thoroughness of trial counsel's investigation, preparation, and the basis of the decision about calling Mr. Smith as a witness.

Id.

Upon remand, the district court held an evidentiary hearing on Holder's ineffective assistance of counsel claim, at which both of Holder's trial counsel testified. Hack Welch, lead counsel for Holder, testified that the government gave him copies of Smith's testimony before the grand jury as well as copies of Oklahoma State Bureau of Investigation ("OSBI") reports documenting interviews with Smith. Welch also interviewed Smith directly. During the evidentiary hearing, Welch testified that he understood from these materials and the interview that Smith's testimony was "[e]xtremely favorable to [Holder]." He stated, "With regard to the shooting . . . what [Smith] saw, what his testimony would have been, what he saw was that it was in self-defense, that Pickens went for his gun first. [Holder] had no choice."

Welch's sole reason for choosing not to call Smith as a witness was his concern that the government would impeach Smith's testimony by showing that Holder was connected to Smith's past conviction for growing marijuana. Welch believed that there was a connection between Smith's 1992 conviction and Holder because Holder himself had been investigated concerning marijuana in August 1993. Welch testified that according to his best recollection, he never recognized the full year difference in the dates of Smith's conviction and of the investigation of Holder. He admitted that he was probably prevented from catching the gap in dates by his "looking over [the information] hurriedly." In addition, Welch explained that he remembered materials provided to him by the government showing that Holder was seen in the same field in which Smith was growing marijuana. When Welch asked Holder whether he had any connection with Smith's conviction, however, Holder "denied any involvement in the marijuana." Notwithstanding Holder's denial, Welch admitted that he did not thoroughly investigate the existence of a conjectural criminal connection between Smith and Holder. Nor did he file, or attempt to file, a motion in limine to exclude any evidence of this connection, and could not recall conducting any research into the Federal Rules of Evidence to determine whether information regarding such a connection could even be introduced by the government.

Because Welch did not investigate the supposed criminal connection between Holder and Smith, he failed to discover that Smith had been charged for

conspiracy to cultivate marijuana along with a co-defendant named Robert Bailey. In an unpublished disposition of this court, we reversed the conspiracy conviction with respect to Smith and reversed Bailey's conviction on all counts. United States v. Bailey, Nos. 93-9009, 93-7009, 1993 WL 525667 (10th Cir. Dec. 17, 1993). We held, with respect to Smith's conspiracy conviction, that the government failed to "proved beyond a reasonable doubt the existence of one or more 'unknown' coconspirators" in addition to failing to prove a conspiracy between Bailey and Smith. Id. at *5. This decision, too, was not discovered by Welch.

At the time Welch made his decision not to call Smith, Welch knew of no probable testimony by Smith that would be damaging to Holder, and thought that Smith had a "very impressive personality" that would make him "a great witness." Welch testified that he felt "intimidated" in federal court, and that this feeling prevented him from sitting down and fully thinking through his decision not to call Smith.

Vester Songer, Holder's second trial counsel, also testified at the evidentiary hearing. Songer explained that, as lead counsel, Welch "really ma[de] the calls in most instances" with respect to Holder's case. However, Songer reached an independent decision that Smith should not be called to testify based on the possible connection of Holder to Smith's marijuana-related conviction. Songer did not conduct any independent investigation of the postulated incident

-10-

and based his decision entirely on the information given to Welch by the government.

Following the hearing, the district court found that Holder had received ineffective assistance of trial counsel and granted his § 2255 petition for habeas relief. The court found that the record before it did "not establish, much less suggest, that there was any connection between Holder and Smith's marijuana cultivation," and that "this information was available to Welch and Songer from a rudimentary examination of the discovery provided by the Government." The court also found:

> Smith's grand jury testimony was consistent with Holder's trial testimony on the key issue of whether Pickens pulled his pistol on Holder prior to Holder shooting. Smith testified Pickens reached for his pistol and jerked it out before he was shot by Holder. Smith's testimony at trial – assuming a consistency with his grand jury testimony – would undoubtedly have been powerful, corroborating evidence of a shooting in self-defense. As this prosecution boiled down to a quintessential swearing match between Holder and Swift (as buttressed by the Government's expert testimony), counsel's failure to present Smith's corroborating eye-witness testimony, combined with counsel's failure to seek a pretrial ruling on the admissibility of the aforementioned marijuana cultivation information, constitutes ineffective assistance of counsel.

In addition, the district court found that counsel's failure to consult with or employ expert witnesses to challenge the testimony of the government's forensic pathology expert about the likelihood that Pickens had drawn his pistol when shot constituted ineffective assistance of counsel. Determining that Holder had established both deficient performance and prejudice under Strickland, 466 U.S.

668, the court granted habeas relief with respect to Holder's conviction of murder in the second degree in violation of 18 U.S.C. §§ 1111(a) and 114(1). The government appeals.

## II

An ineffective assistance of counsel claim presents a mixed question of fact and law. Boltz v. Mullin, 415 F.3d 1215, 1221 (10th Cir. 2005). We review the district court's factual findings for clear error and its legal conclusions de novo. Id. To prove ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, that (1) counsel's performance fell below an objective standard of reasonableness, and (2) defendant suffered prejudice, such that there is a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different. Strickland, 466 U.S. at 688, 693-94. "The proper measure of attorney performance is that of reasonably effective assistance under prevailing professional norms, considering all of the surrounding circumstances." Bryan v. Mullin, 335 F.3d 1207, 1217 (10th Cir. 2003) (en banc). We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. (quotation and citation omitted). In order to be constitutionally ineffective, a "strategic decision must have been completely unreasonable, not merely wrong." Romano v. Gibson, 278 F.3d 1145, 1153 (10th Cir. 2002) (quotation and citation omitted).

"Counsel . . . may make a reasonable decision that investigation is unnecessary." Wallace v. Ward, 191 F.3d 1235, 1247 (10th Cir. 1999). However, the failure to investigate a potential defense strategy without any strategic basis for doing so may constitute ineffective assistance, as the Supreme Court explained in Strickland:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91 (emphasis added). We assess counsel's performance from counsel's "perspective at the time of that performance, considered in light of all the circumstances." Medina v. Barnes, 71 F.3d 363, 368 (10th Cir. 1995). Thus, in considering Holder's claim that trial counsel were ineffective for failing to call Smith as a witness, we determine whether the investigation supporting Welch's and Songer's decision not to call Smith was reasonable considering the circumstances at the time of investigation. See also Holder II, 410 F.3d at 656 ("We are convinced that the circumstances made critical the holding of an evidentiary hearing to develop the thoroughness of trial counsel's investigation, preparation, and the basis of the decision about calling Mr. Smith as a witness.").

We are bound by the district court's findings that the record before it did not suggest any connection between Smith's 1992 conviction and Holder, and that the lack of connection would have been evident upon a "rudimentary examination" of discovery evidence provided to counsel by the government. Appellant does not challenge these findings as clearly erroneous.

We conclude, as did the district court, that failure to conduct even a rudimentary examination of discovery documents cannot be considered an objectively reasonable investigation. This is particularly true when it underlies a decision as crucial as the one at issue here: namely, whether to call a witness whose story largely corroborated the defendant's, and who was the only surviving witness to the alleged murder other than (1) the defendant himself and (2) an alleged victim of a separate crime being tried before the same jury. At the evidentiary hearing, Welch and Songer freely admitted that the only basis for their decision not to call Smith was their fear of Smith's potential impeachment by way of a non-existent connection between Smith's marijuana conviction and Holder. Because that testimony reveals that counsel did not conduct a reasonable investigation into the only basis for their decision, counsel are not entitled to a presumption that their decision was guided by a sound strategic motive. See Williams v. Taylor, 529 U.S. 362 (2000) (holding that counsel's failure to uncover and present significant mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions,

-14-

because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.").

Despite the unreasonable nature of counsel's underlying investigation, and counsel's express testimony on the lack of adequate strategic motive, we must still determine whether counsel's performance constituted objectively reasonable representation under the totality of circumstances. "[E]ven though counsel's strategy was ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record before it might still conclude that counsel performed in an objectively reasonable manner." Bullock v. Carver, 297 F.3d 1036, 1046 (10th Cir. 2002); see also Sallahdin v. Mullin, 380 F.3d 1242, 1250-51 (10th Cir. 2004) (upholding as constitutional counsel's decision not to call an expert witness, despite counsel's failure to identify a strategic basis for that decision, when "the record on appeal supplies at least three reasons why it would have been constitutionally reasonable for counsel not to introduce this evidence") (internal quotation and citation omitted).

In urging us to hold that Holder's counsel performed in an objectively reasonable manner when they failed to call Smith, the government points to four prior statements that it alleges would have rendered Smith's testimony "harmful to the defense": (1) Holder testified that he took his shotgun out of the scabbard when he and Smith crossed the creek, but Smith stated that the shotgun was in the

scabbard after they crossed the creek and until shortly before they encountered the four-wheeled vehicle; (2) Holder testified that he loaded a shell into the shotgun right before shooting Pickens, but Smith testified that he did not hear Holder load the shotgun at that time and surmised a shell was probably already in the barrel; (3) Smith testified to the grand jury that he did not fear Pickens when he and Pickens were exchanging friendly greetings immediately prior to Holder's confrontation with Pickens; and (4) Smith stated to OSBI investigators that he "did not feel in danger" when he saw Pickens "reach behind his waist, real slow, with his right hand [and bring it back around] . . . holding a gun."

With respect to the first reason, Smith testified before the grand jury that he assumed Holder pulled the shotgun out of the scabbard either around the time they passed the four-wheeled vehicle or afterwards. However, Smith also explicitly stated that he did not see Holder draw the gun and did not know for sure when that happened. Because Smith's testimony was ambiguous and the purported differences concern non-determinative details, we do not agree with the government that this testimony would necessarily "seriously undermine[]" Holder's credibility before the jury. We reach the same conclusion with respect to Smith's statement that he did not hear Holder load the shotgun. We also see no reason why Smith's lack of fear while exchanging greetings with Pickens would necessarily cause the jury to disbelieve Holder, as Smith's impressions do not shed direct light on Holder's state of mind at the time of the shooting. Moreover,

Smith's statement that he did not feel in danger when Pickens pointed the gun at Holder neither precludes the possibility that Holder himself felt fear at that point, nor the truth of Smith's later testimony, upon further reflection on the incident, that Smith believed both he and Holder would have been killed by Pickens if Holder had not shot Pickens.

These statements, individually and cumulatively, fail to persuade us that Holder's counsel's decision not to call Smith was objectively reasonable. To the extent these statements are inconsistent with Holder's testimony – and, as explained above, we do not think all of them are – they are minor discrepancies. In fact, given the fraught nature of the shooting, the speed at which it unfolded, and the limitations of human memory, it would strike us as suspicious if two individuals, testifying from their own recollections without prior collusion or coaching, were to recite identical stories devoid of any inconsistencies. More importantly, the discrepancies in the testimonies of Holder and Swift are vastly outweighed by major, material, and beneficial similarities.[2] Accordingly, we hold that the failure to call Smith, based on counsel's unreasonable investigation and

---

[2] The dissent presents a detailed analysis of these potential discrepancies, but declines to consider them in the context of the entire trial. By failing to call Smith, Holder's counsel rested the entire defense on the uncorroborated testimony of the defendant himself, a fact that the government eagerly seized upon in its closing statement. We thus cannot agree that defense counsel's failure to call an available third-party witness who had unflaggingly asserted his belief that "if [Holder] hadn't have fired, he could have been the one dead and maybe me too" was objectively reasonable.

lack of sound strategy, "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

We also conclude that Holder has established prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As the district court correctly noted, the government presented its case as a "quintessential swearing match" between Holder and Swift.[3] Smith's testimony that Pickens drew his pistol before Holder shot Pickens would have provided powerful corroborating evidence for Holder's claim of self defense.[4] As we stated in Holder II, "The potential for the testimony of Smith to have tipped the balance in

---

[3] The government also introduced testimony by expert witnesses in an attempt to persuade the jury that Pickens' gun never left its holster and did not fall to the ground as Holder testified. However, none of the experts established that Pickens had not drawn his pistol when Holder shot. Iris Dalley, a criminalist at the OSBI, stated that she found no blood consistent with a cone-shaped spray pattern on Pickens' sleeve, which she would have expected to find if Pickens' sleeve had been within 18 to 24 inches from the wound. However, she also testified that she could not determine the size of the cone in this particular case and gave no opinion on whether Pickens had indeed drawn his gun. Dalley further noted that Pickens' gun did not have any visible traces of soil, but also stated that she drew no conclusions about "where or when [the gun] might have been on the ground." The other experts similarly failed to give conclusive testimony.

[4] The government suggests that "[f]or self-defensive purposes, it would not be decisive whether Pickens was merely attempting to draw his pistol or had nearly completed his draw," but cites no authority for its argument on this point. In light of the facts and arguments presented to the jury in this case, we do not think a reasonable juror would find it irrelevant whether Pickens had drawn his gun and fixed it on Holder prior to the shooting.

favor of a finding of self-defense is apparent under the circumstances here, where his testimony, if believed, would have bolstered that of the defendant and refuted that of the prosecutions' witness, Swift." 410 F.3d at 655; see also Snow v. Sirmons, 474 F.3d 693, 729 (10th Cir. 2007) ( "[W]e are . . . hard pressed to understand how counsel's failure to call [individuals whose testimony would support the innocence of the defendant and would not be cumulative of evidence already presented] as trial witnesses . . . could be construed as reasonable trial strategy."). We also noted that because "the jurors knew of Mr. Smith's presence at the scene, as it had been mentioned by both Swift and Holder . . . . [Smith's] absence from trial surely must have been noticed." Holder II, 410 F.3d at 656. With the addition of Smith's corroborating testimony, there is a reasonable probability that the jury would have found that the government failed to prove beyond a reasonable doubt that Holder's shooting of Pickens was not an act of self-defense. See Strickland, 466 U.S. at 693-94. Accordingly, Holder has shown that he received ineffective assistance of trial counsel.

## III

Because we conclude that Holder has established ineffective assistance of trial counsel due to counsels' failure to call Smith as a witness, we do not reach the question whether failure to consult or employ expert witnesses also deprived

Holder of his right to effective assistance of counsel.  We **AFFIRM** the decision

of the district court.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge

06-7071, *United States v. Holder*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent.  I have no quarrel with the panel opinion's explication of the governing law and I do not rest my dissent on any disagreement with the panel opinion's analysis regarding the relevance of Mr. Smith's prior conviction (although defense counsel could properly have been concerned that Smith could be impeached by the conviction and that Mr. Holder may have looked less than pristine to the jury for associating with a convicted felon).  Rather, I believe that it would have been objectively reasonable, indeed eminently reasonable, for defense counsel not to call Smith as a witness because a jury would be likely to view his testimony as indicating Holder's guilt.

The chief benefit to Holder of Smith's testimony would have been Smith's corroboration of Holder's testimony that Pickens drew his gun.  Smith, however, was not looking at Holder at that time and could not have known whether Pickens was responding to some aggressive action by Holder, such as raising his shotgun to aim at Pickens, or was the first to act.  Because Smith had no idea what Holder had been doing, Smith was merely speculating when he testified to the grand jury that Holder had only done what he had to.

I would think that Smith's testimony would be at least as important, and probably more so, regarding whether it was Holder or Pickens who was more likely the initial aggressor.  And on that issue his testimony would be harmful to Holder.  Contrary to Holder's testimony, and consistent with Swift's, Smith's

account indicates that it was Holder who was the angry one when Holder and Pickens faced each other.

First, Smith explained the circumstances that led to Holder's heightened emotions. According to Smith, as he and Holder were riding on horseback along the fence before they saw Pickens or his vehicle, Holder had noted a break in the fence and had commented that "they" had cut his fence again. The two then saw a vehicle, which had a gun, perhaps an assault rifle, inside it.

Second, Smith's grand jury testimony suggests, contrary to Holder's trial testimony, that Smith prepared to shoot Pickens (or whoever had been in the vehicle parked near the fence) as Smith and Holder continued past the vehicle. Although Holder testified that he had taken his gun out of its scabbard when he crossed a creek (a wholly "innocent" act), Smith testified that Holder's shotgun was in the scabbard when the two came upon the vehicle. Smith then took the lead and did not see when Holder, traveling behind him, removed the gun; but it had to have been after Holder realized that he was about to come across someone who likely had cut his fence. Also, although Holder testified that he had loaded the shotgun only after Pickens had drawn his gun, Smith testified that he did not hear Holder load the shotgun after they confronted Pickens. As Smith said, "I know that may look bad but I didn't hear it." R. Vol. 1 at 271. If Smith is correct, then Holder's gun was loaded at the start of the ride or Holder loaded it as he and Smith approached the others.

Third, although Holder testified that Pickens was "a rambling and a raging and slinging his hands and cursing" when Holder encountered him, Smith's testimony described Pickens as civil and Holder as the only angry one. His account of the encounter was as follows:

> I just—I greeted them, I threw up my hands just like you meet people in my country there. How are you all doing? I can't think of everything I said. I think I might have said even something about the weather and different things like that. And just as soon as I ended that, Fred spoke right up.

R. Vol. 1 at 231.

> A.  Well, just as soon as I got done greeting them, just like you greet anybody in that country—
> Q.  And at this point in time, it's a friendly exchange between you and Mr. Pickens, is that a fair statement?
> A.  Yes, sir. I guess. They spoke to me. Nothing out of the way, you know.
> * * *
> Q.  What happened at that point?
> A.  Just as soon as I ended, Fred spoke up behind me.
> Q.  What did Fred say?
> A.  He said, you cut my fence again, didn't you? And the man said, no, I didn't.

*Id.* at 235. According to Smith, the shooting occurred promptly after Holder's accusation:

> And then right after that, just kind of as soon as he said no, I didn't, I seen him reach with his right hand back. And then there was a little bit of a hesitation, I don't know what, and then he jerked out a gun. I didn't know if his arm was extended. And just as soon as he jerked it out—it all happened just like that—Fred shot. It just happened just like that.

*Id.*

Smith's testimony suggests not only that Holder was the aggressor, but also that Holder lied about the nature of the confrontation by falsely asserting that Pickens was angrily ranting and that he did not even load his gun until Pickens drew his. A jury could infer that Holder was lying to conceal his aggressive act. A reasonable defense attorney could quite properly decide that Smith's testimony would be more harmful than helpful to the defense.

In my view, we must reverse the district court judgment because Holder has not established ineffective assistance of counsel.